KNUTSON, et al. v. GALLSWORTHY, et al., and five other cases.

COHEN v. SAME, and two other cases.
Nos. 9422–9430.

United States Court of Appeals
District of Columbia.

Argued April 11, 1947.

Decided Sept. 15, 1947.

498

Mr. Oscar C. Limbach, of Cleveland, Ohio, pro hac vice, by special leave of Court, with whom Mr. Almon S. Nelson, of Washington, D. C., was on the brief, for Amos T. Knutson, et al.

Mr. William D. Burrows, of New York City, pro hac vice, by special leave of Court, with whom Mr. Vernon M. Dorsey, of Washington, D. C., was on the brief, for Samuel J. Cohen.

Mr. Benjamin B. Schneider, of New York City, with whom Messrs. Lee B. Kemon, of Washington, D. C., R. J. Dearborn and Daniel Stryker, both of New York City, and Max Dressler, of Chicago, Ill., were on the brief, for Jimmiebel Gallsworthy and The Texas Company.

Mr. Edwin R. Hutchinson, of Washington, D. C., entered an appearance for appellees John W. Wolfe, et al.

Mr. Edwin L. Reynolds, United States Patent Office, of Washington, D. C., entered an appearance for appellee Casper W. Ooms.

Before EDGERTON, WILBUR K.

MILLER, and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

These are nine appeals from judgments in six[1] civil actions brought in the District Court under R.S. § 4915,[2] praying authorizations for the issuance of patents. The actions were consolidated for trial below and for argument and decision here. The invention is a chemical composition suitable as an extreme pressure lubricant. The controversies arose in four interference proceedings among applicants in the Patent Office, finally involving eleven claims or counts. Priority as to one count was awarded by the Patent Office to applicants Morell, et al.,[3] as to three counts to applicant Cohen, and as to the other seven counts to applicant Gallsworthy. The District Court reached and entered conclusions that Cohen and Gallsworthy were entitled to receive patents upon all counts awarded to them by the Patent Office and that Gallsworthy was entitled to receive a patent on the count initially awarded to Morell. It therefore dismissed all the bills of complaint, together with the crossclaims and counterclaims, except that in one action[4] it reversed the decision of the Patent Office and authorized the issuance of a patent to Gallsworthy on the one claim which had been awarded by the Patent Office to Morell. The latter's motion to reopen was denied.

We are met first with the question whether the court must decide in this proceeding the patentability of the several claims involved. It is true that in a direct appeal from a decision of the Patent Office in an interference proceeding, only the question of priority is involved,[5] but this is

---

[1] Civil Actions Nos. 19,801, 20,052 and 20,053, appealed by Morell and by Cohen; Nos. 23,872, 23,873 and 23,874, appealed by Morell.

[2] Rev.Stat. § 4915 (1870), 53 Stat. 1212 (1939), 35 U.S.C.A. § 63.

[3] Morell, et al., were LeGrand Morell and Amos T. Knutson and their assignee. Their interest was designated in the Patent Office as "Morell et al.", and we shall designate it "Morell" in this opinion. LeGrand Morell now being deceased, this interest is named in the captions of these appeals and in the briefs as "Amos T. Knutson, et al."

[4] Civil Action No. 19,801.

[5] This was the rule under the old procedure, when the direct appeal was to the Supreme Court of the District of Columbia and, by later statute to this court. Frasch v. Moore, 1908, 211 U. S. 1, 29 S.Ct. 6, 53 L.Ed. 65; Hill v. Hodge, 1898, 12 App.D.C. 528; Lynch v. Headley, 1923, 52 App.D.C. 269, 285 F. 1003; Prichard v. Setzler, 1924, 54 App.D.C. 266, 296 F. 1013. It is still the

not true in equity suits brought in the District Court under Section 4915.[6] This latter rule—specifically that no decree should authorize the issuance of a patent to either party to the interference unless invention is present—was established by the Supreme Court in 1890 in Hill v. Wooster.[7] That case was referred to and distinguished recently in Hoover Co. v. Coe,[8] but it is not our understanding that it was overruled, although there is language in the later opinion which may reflect a view contrary to the earlier one. For example, the Court said that "the effect of adjudication in equity [is] the same as that of decision on appeal",[9] which would seem to imply that in an R. S. § 4915 proceeding the court might decide one question—such as priority—and leave all other questions for other determination, as does the Court of Customs and Patent Appeals.[10] Again, the Court referred to cases in which federal courts have taken jurisdiction under Section 4915, "where it affirmatively appeared that further proceedings in the Patent Office would be necessary following adjudication in favor of the applicant, and where though it did not appear of record that further proceedings would be required in the Patent Office, it was evident that they might ensue adjudication, as where a patent was denied for want of invention." [11] We have reexamined the cases cited by the Court to the foregoing, but in none of them does it appear that the trial court declined to pass upon an issue raised in the pleadings before it. Hoover Co. v. Coe, supra, was concerned with jurisdiction to entertain a complaint, and not with jurisdiction over questions raised by the plead-

ings once the action itself is held proper. The answer to the specific question involved seems to be the full extent of the decision of the Supreme Court. The Court left the rule of Hill v. Wooster, supra, intact, distinguishing that case by saying: "That case was one in which the Commissioner had decided an interference between the claims of two applicants in favor of one of them, and ordered that a patent issue. In an inter partes suit by the unsuccessful applicant against the successful one, this court held that if it appeared that neither application disclosed invention (a matter which should have moved the Commissioner not to declare an interference) the bill should be dismissed. The court did not purport to decide what Patent Office rulings are reviewable under R.S. § 4915."

Moreover, in a footnote, the Court said: "Section 16 of the Act of 1836, 5 Stat. 123, supra, expressly provided that upon a bill filed as a result of Patent Office decision on an interference the court might adjudge either of the patents void in whole or in part. This language was evidently omitted in later acts as surplusage, for obviously if either patent was void for lack of invention, or other cause, the question of interference disappeared."

This last-quoted language is a clear indication that if there be a dispute as to the validity of a patent upon an application involved in an interference proceeding, the court must not enter an affirmative decree unless it finds that invention is present. We note also that the Court referred with apparent approval to the decision of this

rule under the new procedure, where direct appeal is to the Court of Customs and Patent Appeals. Hendrickson & Nelson v. Ronning, 1935, 76 F.2d 137, 22 C.C.P.A., Patents, 1040; Walsh v. Davidson, 1939, 101 F.2d 224, 26 C.C.P.A., Patents, 812; Rava v. Charlton, 1939, 105 F.2d 798, 26 C.C.P.A., Patents, 1398; Mantz v. Jackson, 1944, 140 F.2d 161, 31 C.C.P.A., Patents, 824; Koch v. Lieber, 1944, 141 F.2d 518, 31 C.C.P.A., Patents, 979.

[6] Triplett v. Line Material Co., 7 Cir., 1943, 133 F.2d 533, 534; Radtke Patents Corp. v. Coe, 1941, 74 App.D.C. 251, 122 F.2d 937, certiorari denied, 1941, 314 U.S. 695, 62 S.Ct. 411, 86 L.Ed. 556 (cit-

ed with approval in Hoover Co. v. Coe, 1945, 325 U.S. 79, 90, 65 S.Ct. 955, 89 L.Ed. 1488.

[7] 1890, 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502.

[8] 1945, 325 U.S. 79, 65 S.Ct. 955, 89 L. Ed. 1488.

[9] Id., 325 U.S. at page 88, 65 S.Ct. at page 959, 89 L.Ed. 1488.

[10] Walsh v. Davidson, 1939, 101 F.2d 224, 26 C.C.P.A., Patents, 812; Rava v. Charlton, 1939, 105 F.2d 798, 26 C.C. P.A., Patents, 1398.

[11] Hoover Co. v. Coe, supra, 325 U.S. at page 89, 65 S.Ct. at page 960, 89 L. Ed. 1488.

court in Radtke Patents Corp. v. Cole,[12] in which we held that if an issue as to patentability is raised in the District Court in an action under R.S. § 4915, it must be decided. In the case at bar, the issue of patentability was raised in the District Court and is raised here, and so must be decided.

■■ We fully realize that the consequences of the rule just indicated, when coupled with the doctrine of res judicata, may be far-reaching. That doctrine imposes finality of decision not only upon issues actually raised but upon issues which might have been raised. Fishgold v. Sullivan Drydock & Repair Corp., 1946, 328 U.S. 275, 282, 66 S.Ct. 1105, 90 L.Ed. 1230, 167 A.L.R. 110. Thus, it would seem that if any question as to the issuance of a patent can be raised in a Section 4915 proceeding, all questions as to that issuance would be foreclosed by the decision, in so far as the parties to the proceeding are concerned. We also realize that the consequences of res judicata in these circumstances may be in conflict with implications in Hoover Co. v. Coe, supra, that further proceedings in the Patent Office may occur after judgment in a Section 4915 proceeding. But we do not have a res judicata question before us. We go only so far as to say that patentability is a proper issue in a proceeding under Section 4915 and, if raised, must be decided, even though the Patent Office decision from which the case arose was in an interference proceeding. Non-patentability is "a matter which should have moved the Commissioner not to declare an interference." [13]

Upon these appeals, Morell contends that none of the claims involved is patentably distinct from the disclosures of a so-called "Lincoln patent" [14] and that certain of the claims are unpatentable over others. Cohen makes the same contention as to the Lincoln patent and also says that none of the claims is patentable over the broad claim titled "composition of matter" and designated as Count 1 in Interference No. 78,460. Gallsworthy contends that the counts in the several interferences obviously differ in scope, that the Lincoln patent does not in fact disclose the subject matter of the claims here involved, and that all questions as to patentability were decided by the Patent Office and the District Court, the findings of which were supported by substantial evidence.

■ The elements of patentability as provided by the statute[15] are not one but several. They include not only a patentable subject matter but also other characteristics, among them novelty. The invention must be "new" and "not described in any printed publication" before the claimed invention. It is not disputed in the present case that the subject matter of the claimed invention is within the patentable matters enumerated in the statute, but a dispute is presented as to the novelty of these claims in view of the prior art; the core of the dispute being the effect of the disclosures in certain publications prior to the pending applications. In addition, the statute, in prescribing the basic requisites to the issuance of a patent, provides that the person who has invented the new art, etc., may obtain a patent, and thus confines patentability to that one person. That consideration is pertinent to patentability in the present case, because a dispute exists here as to whether one person can obtain a patent on a specific claim to a composition of matter which is identical in its ingredients with a generic claim patented to another. The question is whether the eleven claims in the case involve only one invention and are therefore patentable to only one inventor,[16] or whether they involve several inventions, of which there

---

[12] 1941, 74 App.D.C. 251, 122 F.2d 937, certiorari denied. 1941, 314 U.S. 695, 62 S.Ct. 411, 86 L.Ed. 556.

[13] Hoover Co. v. Coe, supra, 325 U.S. at page 90, 65 S.Ct. at page 960, 89 L.Ed. 1488.

[14] Patent No. 1,945,615, issued February 6, 1934, upon an application filed July 14, 1932, by Bert H. Lincoln and Alfred Henriksen.

[15] Rev.Stat. § 4886 (1870), 29 Stat. 692 (1897), 46 Stat. 376 (1930), 53 Stat. 1212 (1939), 35 U.S.C.A. § 31.

[16] I. e., the first inventor of the one invention. Alexander Milburn Co. v. Davis-Bournonville Co., 1926, 270 U.S. 390, 402, 46 S.Ct. 324, 70 L.Ed. 651; Earles v. Gomber, 1921, 50 App.D.C. 389, 273 F. 353; International Seal & Knot Protector Co. v. E. J. Brooks Co., 3 Cir.,

may be different inventors. Thus, the disputed features of patentability in this case are (1) whether the claims are patentable over the disclosures in prior art references and (2) whether the several claims are patentable to different persons. We think that under the general rule that the court, in an action under R.S. § 4915, must determine patentability, the court must determine these disputed features of patentability, just as it might have to decide any other disputed issue concerning invention. This requirement of decision by the court rests not only upon the authorities above mentioned, but also upon reason. A court could not, as required by Section 4915, adjudge that a named person "is entitled, according to law, to receive a patent for his invention" if in demonstrable fact the statute does not permit the patent to that person. We are not dealing with the problem of prior art references newly discovered after the court's adjudication,[17] but with issues present in the case from its inception. To hold otherwise would be to hold that the court should decide one issue presented to it but close its eyes to others equally determinative of the ultimate adjudication.

The District Court made no findings upon the subject of patentability in the present case except to say that, no new evidence having been introduced in that court, the finding of the Patent Office upon that matter would not be disturbed.[18] In this absence of underlying findings by the District Court, and in the presence of that court's specific adoption of the conclusion of the Patent Office, we turn back to the findings of the Patent Office for a basis of decision upon the point. The records of the proceedings in the Patent Office are in the present record as exhibits. But we are unable to find in the Patent Office records either definitive conclusions of patentability, in terms of the controverted issues, or findings of the underlying facts from which a definitive conclusion could be reached.

The "Lincoln patent" application, filed July 14, 1932, disclosed[19] a high-pressure lubricant which consisted of an ordinary lubricant plus halogenized high boiling hydrocarbons, or, more specifically, 1% chlorinated hydrocarbon wax with a melting point of about 130° F., the wax being from animal, vegetable or petroleum origin. The eleven counts in the present proceeding are variously titled. The chief component in all of them is an ordinary lubricating oil, and the additives in them are all chlorinated. But these additives are described, respectively, as a paraffin hydrocarbon, a fluid fraction of petroleum, non-volatile mineral oil, mineral lubricating oil, lubricat-

1938, 98 F.2d 647, 648; International Carbonic Eng. Co. v. Natural Carbonic Products, D.C.S.D.Cal.1944, 57 F.Supp. 248, 258, affirmed, 9 Cir., 1946, 158 F. 2d 285; Application of Beck, 1946, 155 F.2d 398, 33 C.C.P.A., Patents, 1060.

[17] Gold v. Newton, 2 Cir., 1918, 254 F. 824 (cited to this point in Hoover Co. v. Coe., supra).

[18] The finding in Civil Action No. 23,-872 was:

"That no substantial evidence has been presented to overcome the findings in the Patent Office that the subject matter of the counts of the aforesaid interference are patentable."

The finding of fact in Civil Actions Nos. 19,801, 20,052, 20,053, 23,873 and 23,-874 was:

"The Patent Office, in the proceedings before it, found the subject matters of the various counts of the interferences Nos. 78,460, 69,703 and 77,416 to be patentable and to distinguish patentably from each other. No substantial evidence has been presented in any of the

cases consolidated for trial to overcome those findings in the Patent Office. The only art presented at the trial in these cases was before the Patent Office and was fully considered by it."

The conclusion of law in the latter cases was:

"The evidence presented, in any of the cases, on the patentability of the counts to the parties, or any of them, is not substantial and does not overcome the findings in the Patent Office that the subject matters in the several counts involved in the interferences are patentable."

[19] Alexander Milburn Co. v. Davis-Bournonville Co., 1926, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651, followed, Detrola Radio & Television Corp. v. Hazeltine Corp., 1941, 313 U.S. 259, 265, 61 S.Ct. 948, 85 L.Ed. 1319, rehearing denied, 1941, 314 U.S. 576, 62 S.Ct. 52, 86 L. Ed. 564; cf. Old Town Ribbon & Carbon Co. v. Columbia Ribbon & Carbon Mfg. Co., 2 Cir., 1947, 159 F.2d 379, 381, 382.

ing oil free from sulphur, mineral oil, and kerosene.[20] In the Patent Office, priority as to the claim for "A composition of matter" of which the ingredients were a mineral lubricating oil and a non-volatile chlorinated paraffin hydrocarbon (Count 1 in Interference No. 78,460), was awarded to Morell. At the same time, a claim, likewise titled "A composition of matter", consisting of a mineral lubricating oil and "chlorine in chemical combination with a fluid fraction of petroleum" (Count 2 in Interference No. 78,460), was awarded to Gallsworthy. And two counts titled "A metal cutting composition"—but identical in ingredients with the two foregoing counts—(Counts 2 and 5 in Interference No. 75,-209), were awarded to Cohen. A count titled "A lubricating composition", of which the ingredients were an unchlorinated mineral lubricating oil and a chlorinated mineral lubricating oil (Count 2 in Interference

No. 69,703), was awarded to Gallsworthy. Whether the claims awarded by the Patent Office to the three different persons, are patentably distinct from each other, so as to be patentable to different persons, is obviously a question of fact. And so is the question whether these claims, or any of them, are patentably distinct from the disclosures in the Lincoln patent.

Fundamentally these questions of fact are questions of chemistry. But we do not find in this record any conclusions couched in chemical terms. The closest approach to one is a statement of the Board of Interference Examiners in Interference No. 78,460 when it awarded one count to Morell and the other to Gallsworthy. The Board said: "The former [Count 1] of these limitations is believed to include any chlorinated paraffin hydrocarbon which is non-volatile after chlorination. In the case of count 2, on the other hand, it is clearly specified that the

---

20 The counts or claims in issue were:
Interference No. 78,460—

"1. A composition of matter comprising a mineral lubricating oil and a relatively small proportion of a substantially non-volatile chlorinated paraffin hydrocarbon as essential ingredients."

"2. A composition of matter comprising a mineral lubricating oil and a small percentage of chlorine in chemical combination with a fluid fraction of petroleum, the compounds formed being substantially non-volatile."

Interference No. 69,703—

"1. A lubricant suitable for lubrication under extreme pressures comprising essentially mineral oil and a small percentage of chlorine in chemical combination with non-volatile mineral oil, the compounds formed being also non-volatile."

"2. A lubricating composition having as a primary lubricating constituent the combination of unchlorinated mineral lubricating oil and a minor proportion of chlorinated mineral lubricating oil."

"3. An extreme pressure lubricant comprising as a primary lubricating constituent the combination of unchlorinated mineral lubricating oil and a minor proportion of chlorinated lubricating oil, the lubricant being free from added sulphur."

Interference No. 77,416—

"1. An extreme pressure lubricant for use between relatively moving metallic surfaces, comprising a body of refined mineral lubricating oil, the ability of which to prevent seizure and scoring be-

tween relatively moving metallic surfaces operating under conditions of extreme pressure, has been substantially increased by the addition thereto of a minor amount of chlorinated mineral oil."

"2. The method of improving a body of refined mineral lubricating oil to very substantially increase its ability to prevent seizure and scoring when used as a lubricant between relatively moving metallic surfaces operating under conditions of extreme pressure, which comprises dissolving in said body a small amount of chlorinated mineral oil."

"3. The method of reducing the friction between relatively moving metallic surfaces which comprises maintaining therebetween a film of lubricating oil and at the same time chemically acting upon such surfaces by means of chlorine present in said oil film in the form of a minor amount of chlorinated mineral oil."

Interference No. 75,209—

"1. A metal cutting composition comprising a mineral lubricating oil and a relatively small proportion of chlorinated kerosene as essential ingredients."

"2. A metal cutting composition comprising a mineral lubricating oil and a relatively small proportion of a substantially non-volatile chlorinated paraffin hydrocarbon as essential ingredients."

"5. A metal cutting composition comprising a mineral lubricating oil and a small percentage of chlorine in chemical combination with a fluid fraction of petroleum, the compounds formed being substantially non-volatile."

fraction of petroleum to be chlorinated, shall be fluid prior to such chlorination step." The language quoted seems to mean that a paraffin hydrocarbon which would be non-volatile after chlorination could not be a fluid fraction of petroleum prior to chlorination. But there is nothing in the way of a basic finding of fact to show that this scientific implication is correct, and the chemistry reflected by general authorities seems to indicate the contrary.

As a matter of general chemical knowledge, paraffin (singular) is a solid consisting of a mixture of hydrocarbons, and is a constituent of petroleum.[21] However, the plural "paraffins" is a group name for the saturated aliphatic hydrocarbons of the methane series, of a general formula $C_n H_{2n+2}$. That series begins with the gaseous methane and goes in series up to the solid hexacontane of considerable molecular weight (circa 843). So that a paraffin hydrocarbon may be a gas, a liquid of any one of several different densities, or a solid of several different specific gravities. There are several oils in this series. "Mineral oil" (singular) is defined chemically as paraffin oil, or its homologues. Mineral oils (plural) are said to include any oil obtained from inorganic matter, and thus include petroleum. Petroleum is a native mixture of a solution of hydrocarbons and may be one of a number of oils; it may have a paraffin base or a naphthene (asphalt) base. Kerosene is a mixture of hydrocarbons and is a fractional distillate of petroleum. So that, merely from the standpoint of general chemical information, it appears that a hydrocarbon wax from a petroleum origin could be a paraffin hydrocarbon, and a fluid fraction of petroleum might be a paraffin hydrocarbon, and a mineral oil might be both a paraffin hydrocarbon and a fluid fraction of petroleum; and kerosene would appear to be both. In other words, the descriptions of the several additives in the otherwise identical claims in the case appear to overlap. The difficulties presented by the foregoing scientific data are discussed in the briefs, and the pertinence of their accurate determination to the issues in the case is apparently accepted.

This court cannot decide questions of scientific fact, such as the foregoing, upon the basis of its own knowledge or upon standard generalized authorities, in the absence of findings of fact by the District Court or the Patent Office, based upon evidence in the record. It is true that in the Radtke case, supra, we made extensive references to standard authorities not in the record, but in that case there were in the record full evidence, findings and conclusions upon the point at issue.

Absent findings of the underlying facts, we look for a definitive conclusion by the Patent Office as to patentability which might constitute the basis for the District Court's adoptive finding. We do not find any such conclusion stated in respect to the patentability of the different claims to different people, except the one to which we have referred respecting Counts 1 and 2 in Interference No. 78,460, and that one, as we have indicated, is unsatisfactory in the absence of more specific underlying findings.

In respect to the patentability of the present claims over the disclosures of the Lincoln application, the record is in confusion as to the conclusions of the Patent Office. Consideration of that patent is found in two of the interference proceedings. For the purpose of declaring Interference No. 75,209, a primary examiner found a certain claim (subsequently Count 1 thereof) to be allowable and suggested it to Cohen. During the motion period in this interference, Morell moved to add five new claims or counts (only four of which are important to our present consideration, being before us as Counts 2 and 5 of Interference No. 75,209 and Counts 1 and 2 of Interference No. 78,460). He suggested their *unpatentability* over the Lincoln patent and

---

[21] The generalities stated in this paragraph can be found in any authoritative work on chemistry. E. g., Hackh's Chemical Dictionary (3d ed. 1944); Bennett's Concise Chemical and Technical Dictionary (1947); Condensed Chemical Dictionary (Gregory's 3d ed. 1942). See also Webster's New International Dictionary (1945); Funk & Wagnall's New "Standard" Dictionary (1946).

demanded that Cohen be required to swear back of [22] that patent as he, Morell, had done during the ex parte proceedings on his application. Concerning Counts 2 and 5 (each drawn to a "metal cutting composition"), the primary examiner agreed with Morell's contentions, admitting the counts to the interference upon Cohen's swearing back of the Lincoln patent. This was a clear holding that these two counts were unpatentable over the disclosure of the cited prior art reference. His refusal to admit the remaining two counts (each drawn to a "composition of matter" but otherwise respectively identical to the admitted counts) was premised on his finding that, as read in the light of Morell's disclosures, they were not patentably distinct from the "metal cutting composition" counts. The Board of Appeals reversed this holding and directed that these two counts be admitted subject to the same conditions in respect to Rule 75.[23] This latter restriction, it seems to us, can only be interpreted as a holding that these two counts (subsequently made the subject of a separate and different interference proceeding, No. 78,460) also were unpatentable over the Lincoln patent's disclosures.

At only one other place in the reported proceedings of the four interferences do we find the Lincoln patent mentioned as a prior art reference. Interference No. 69,703 had been declared originally upon one claim found allowable by a primary examiner and suggested for purposes of an interference to Cohen and Gallsworthy. During the subsequent motion period, two counts, among others, were suggested by one of the parties as proper additions to the proceeding. The primary examiner found these two counts clearly unpatentable for reasons of record in the file of one of the other parties to the interference, and he rejected them without specifically mentioning the Lincoln patent. In the same general opinion, however, he cited that patent as the basis upon which other proposed counts should be rejected. The Board of Appeals reversed the primary examiner in respect to the two counts, saying that they "are not anticipated by the cited art and are so similar to the original count that we do not feel justified in questioning the patentability of their subject matter." No "cited art" was named in the Board's opinion as being directed to these two counts. We are unwilling to infer that the Lincoln patent, cited in the opinion of the primary examiner but not expressly employed by him in considering these two counts, was within the ambit of this "cited art". These two counts subsequently, and pursuant to the Board's decision, became Counts 2 and 3 of Interference No. 69,703.

The sum total of the foregoing is that we have a clear holding at one stage of the proceedings in the Patent Office that four of the eleven claims are unpatentable over the Lincoln patent, but we find no holding one way or the other in this respect as to the other seven claims; and we find no stated conclusion as to the patentability of any one of these claims over the others, to different inventors, except the one unsatisfactory statement in Interference No. 78,-460. The questions as to the chemical relationship between the various ingredients in the several claims, to which we have alluded, make wholly doubtful what the ultimate conclusion of the Patent Office was, or might have been, as to patentability over that prior art reference, or as to patentability to different persons.

In this state of affairs we are asked to infer from the general rules of Patent Office procedure that that Office held these claims patentable in the manner and to the persons to whom they were awarded.

Patent Office Rule 95 provides that "Before the declaration of interference it must be determined that there is common patentable subject matter in the cases of the respective parties. The issue must be clearly defined and be patentable to the respective parties, subject to the determination of

---

[22] This expression is a reference to an affidavit under Rule 75 of the Patent Office, 35 U.S.CA.Appendix, in which an applicant for a patent swears that he conceived of a given invention, reduced it to practice, and was diligent in its development prior to the date upon which another applicant filed his application.

[23] Rules of Practice in the United States Patent Office, Appendix to Tit. 35, U.S.C.A.

the question of priority." The rule is applicable to counts in an original declaration of an interference under Rules 94 and 109 and to the counts in a redeclared interference under Rule 109. Decisions required by Rule 95 as to patentability and as to the ability of each party to make the counts are within the duties of the primary examiners, subject to review by the Board of Appeals. As to each of the eleven counts involved in these four interferences, it was affirmatively recited, in general terms, by the primary examiner or by the Board that both requisites were fulfilled. We are asked to accept these rulings as controlling upon the ques- of patentability now before us. This we cannot do.

If these proceedings had involved only one interference, in which all the claims were stated and to which all the parties here were parties, some inferences, in respect to patentability and patentable distinctions, from the circumstances and rules might be proper. We do not pass upon that question, because we do not have that situation before us. The situation here is that there were four interferences, in which the claims stated were different and the parties were different, and different claims were awarded to different people. In that situation we will make no inferences where the findings as stated do not expressly refer to the disputed question. In other words, we will not infer from the bare announcement that a given claim is "allowable", that the examiner or the Board meant to find that the claim was patentably distinct from another claim not involved in that proceeding. And we will not infer that he, or it, meant to find patentability over a disputed prior art reference which he did not mention. For example, in Interference No. 69,703 a motion to dissolve was made upon the basis of two German patents and a patent to one McQuaid as alleged prior art references. The Board of Appeals considered the named patents and concluded its discussion with the sentence, "The claim is patentable." We will not infer from that statement that the Board meant to find patentability over the Lincoln patent or over the counts in the other interferences, neither of which subjects was mentioned. We cannot tell from

that finding what the Patent Office would have held upon the now disputed issues of patentability.

Moreover, other statements and findings by the primary examiner and by the Board of Appeals, to some of which we have referred, cast serious doubts upon the patentability of at least some, if not all, of the claims made. We have already discussed the doubts which arise from the discussions of, and rulings upon, the Lincoln patent. Other instances appear involving the patentability of the several counts over each other. The Board of Appeals at one point found that Morell, having claimed a "metal cutting composition", could claim a "composition of matter" of the same ingredients. That is said to be a finding that the two counts are patentably distinct. To us it indicates the contrary, in so far as patentability refers to the right of different persons to take patents on the same compound are concerned. It may very well be that the two counts are so distinct as that the holder of a patent on the generic "composition of matter" is entitled to state separately in the same patent a claim to specified uses of the same substance; and, in that sense, the two claims may be patentably distinct. But it does not follow that they are so distinct as to authorize the issuance of separate patents to separate persons. No discussion whatever appears in the record as to the patentability of the counts titled "lubricant", "lubricating oil", or "method" over those titled "composition of matter" or "metal cutting composition".

With respect to the counts titled "method", which are Counts 2 and 3 in Interference No. 77,416, we cannot infer a finding of fact that these counts are patentably distinct, as between different patentees, from those counts which describe the composition of the substance. One method is described as a "dissolving" of the additive in the base oil, and the other as reducing the friction between moving metallic surfaces by using the substance. When the substance is a lubricating oil which consists of a base oil with an additive merely mixed in, as is the case here, we do not see how a method of merely "dis-

solving" one into the other could be patentably distinct from the composition itself, in so far as patentability implies the issuance of a patent to one person for the composition and another patent to another person for the method. The same observation applies to a method count which merely describes the reduction of friction between moving surfaces by a lubricant which is otherwise patented.

In the Radtke case, supra, we said that we would not assume that patentability had been determined, but must find it shown by findings and conclusions contained in the record presented to us.

■ In view of all the foregoing, the case will be reversed and remanded for further findings of fact by the trial court with respect to the underlying chemical facts which will support conclusions of fact as to the patentability of each of the counts involved in this appeal, in respect to each other such count, both in contemplation of the issuance of one patent upon all counts to one person and in contemplation of the issuance of several patents to different persons upon the several counts; and also the basic chemical facts which will support a conclusion as to the patentability of each of the counts over the disclosures of the Lincoln application of July 14, 1932.

■ This situation presents some interesting questions as to the procedure of the court in ascertaining and finding scientific facts of the sort here involved. These facts differ from the ordinary facts in lawsuits, as to which there are only a few witnesses, and those may differ in recollection or observation. Scientific facts such as chemical compositions are absolute and are known to many people; although, of course, such people may necessarily be only those learned in the field. When a court is required to adjudicate rights upon the premise of such facts, it ought not to be restricted to partisan or chance evidence. Of course, in many cases, probably in most cases, the witnesses presented by the parties are of a calibre to be satisfactory in the presentation of scientific data. But if they are not, the court should exercise the full extent of its control over the proceedings to insure its own accurate understanding of the requisite facts. No individual judge can know, of his own uninstructed knowledge, all the scientific facts in every field. But he is not required to rest his conclusions, either one way or the other in a controversy, upon less than complete and correct information upon such facts. He is entitled to rely heavily upon the formal findings of experts, if he has such findings before him. But even then, if those findings are challenged, they must be such as to be understood before the court can rest its conclusion upon them. In the cases at bar, the court can suggest to the private parties the necessity for disinterested, qualified evidence upon such points as it feels the need of evidence in addition to that initially presented. The Commissioner of Patents is also a party, and the experts in his office are available. As a last resort, the trial court has the power of subpoena sua sponte. Of course, an agreed statement, to which the Commissioner was a party, of the underlying scientific facts would be the most satisfactory disposition of the problem.

The foregoing observations are not to be understood to relate to the rules governing burden of proof. We are not considering a situation where the judge acts upon a failure of proof, but one in which he undertakes to make findings of the facts.

■ It would obviously be helpful if the trial court, in this somewhat novel procedural situation, where four separate proceedings in the Patent Office became combined in one proceeding in the court, and where inferences which might be drawn from a single proceeding in that Office are impossible, could remand the cases to the Patent Office for further findings of fact. But we have been unable to find authority for such a remand in a proceeding under Section 4915. The action is de novo and not an appeal. The record of the proceedings in the Patent Office is admitted as though evidence in the pending case and not as a record being reviewed upon appeal. Whether a record of supplemental action in the Patent Office, occurring after this remanding order but prior to further proceedings in the District Court, would be

admissible in that court upon motion of a party, is not now before us.

We come now to the questions of priority among the parties, which should be resolved, since further consideration by the District Court has been directed, and these questions may continue to be important. Two such questions are presented. The first is whether Morell reduced his conception to practice prior to the Gallsworthy application. The second is the same question as to Cohen.

■ The Patent Office held, in Interference No. 78,460, that Morell effectively reduced the invention to practice by his automobile road tests in August, 1932, in conjunction with his series of laboratory tests. The District Court took the view that since corrosion is an important consideration in the practicability of a lubricant, it was necessary that the engine in which the road tests had been made, be taken down and its inner surfaces examined for corrosion, before the test could be said to be a reduction to practice. Laboratory tests for corrosion had been made by Morell, and the compound found satisfactory in that respect. The Board of Appeals considered at some length the nature of the tests necessary to establish a reduction to practice of a lubricant. It held that both laboratory tests and actual service tests are necessary, since each type of test establishes different desirable properties of the oil composition. It held that the laboratory tests plus the road tests by Morell together constituted a satisfactory test as to the required qualities. The District Court, in effect, held that they were not. On the present record, we agree with the Patent Office on this point. We understand that if a substance be corrosive of metals, that fact will appear in proper laboratory tests. We note that the Federal Specification for lubricants[24] directs laboratory tests upon the matter of corrosion. However, since the cases are remanded for further findings, we will not foreclose the District Court upon this point of fact, i. e., whether a laboratory test of the sort made by Morell, combined with an observation of the oil after road tests, is a satisfactory demonstration, scientifically speaking, of the corrosive quality of the compound. Findings upon this question of fact should be made.

■ In respect to Cohen's claim to a reduction to practice, we agree with the Patent Office and the District Court. Cohen argued there, and argues here, that "A composition of matter is reduced to practice when it is completely composed." He cites Corona Cord Fire Co. v. Dovan Chemical Corp.[25] and Kyrides v. Bruson.[26] He, therefore, contends that when he mixed a lubricating oil and a chlorinated paraffin wax, and found them miscible, he reduced to practice the composition of matter, and that no tests were necessary. The Board of Interference Examiners distinguished the cases cited, because in them, it said, the problem was one of producing the compound, the properties of the compound being known in case its production was accomplished. In the present case, said the Board, the problem was not in production, since that was merely a matter of mixing the two ingredients. No special properties of the mixture were known, although obviously any mixture consisting principally of lubricating oil would be expected to have some lubricating properties. For these reasons, the Board held that it was necessary that it be demonstrated that the mixture possessed extreme pressure lubricating properties not possessed by the oil alone, and that tests were thus necessary. We agree. The problem involved in the invention was the suitability of the product for usefulness, and not its mere production. So that the mere mixing of the two ingredients, without more, could not be deemed a demonstration equivalent to a reduction to practice.

■ There remains the question of the admissibility of certain evidence proffered by Morell in the court below, and denied admission by that court. The rule is well settled that new and additional evi-

[24] VV-L-791c, May 12, 1945, Sec. IV (part 5), approved by the Director of Procurement, for the use of all departments and establishments of the Government.

[25] 1928, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610.

[26] 1939, 102 F.2d 416, 26 C.C.P.A., Patents, 986.

dence may be received in a civil action under Section 4915,[27] but it is equally well settled that a party may not successfully offer to the court evidence withheld from the Patent Office.[28] The answer to the present question depends upon whether the latter limitation applies. The testimony proffered was that of an expert in chemistry and concerned three questions. The first was whether propane is a fluid fraction of petroleum. The Board of Appeals had held that it is not. Morell evidently considered that ruling to be based upon the proposition that the gaseous propane is not "fluid", and moved for reconsideration. The Board of Appeals explained in its ruling upon the motion that the basis of its ruling was that propane is not a "fraction" of petroleum. The second question, to the same witness, concerned the chemical nature of the chlorinated mineral oil disclosed in the Gallsworthy application, and the third question concerned the nature and value of laboratory tests of a lubricant. The admissibility of evidence of this sort in a case such as this should be determined by the necessities of the case. The court is sitting without a jury; the facts involved are scientific in nature; the court is called upon to adjudicate rights upon the basis of those facts. It follows that if the evidence would assist the court, and if no bad faith on the part of the profferer is involved, such as deliberate withholding for some tactical reason, the court could receive the evidence;[29] in fact, as we have already pointed out, the situation might be such as to require the court to seek such evidence. In this situation the court should not consider itself bound by a rule excluding evidence not offered to the Patent Office. The District Court is directed that in its further consideration of these cases, it may receive this evidence, if the evidence otherwise in the record concerning these scientific facts is not sufficient or satisfactory as a basis for findings of such facts.

Reversed and remanded for further proceedings in accordance with this opinion.

---

27 "* * * In all suits brought hereunder where there are adverse parties the record in the Patent Office shall be admitted in whole or in part, on motion of either party, subject to such terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court may impose, *without prejudice, however, to the right of the parties to take further testimony.*" Rev.Stat. § 4915, supra. (Italics supplied.) Hoover v. Coe, supra, 325 U.S. at page 83, 65 S.Ct. at page 957, 89 L. Ed. 1488; Butterworth v. United States, 1884, 112 U.S. 50, 61, 5 S.Ct. 25, 28 L.Ed. 656, 659; American Steel & Wire Co. of New Jersey v. Coe, 1939, 70 App. D.C. 138, 140, 105 F.2d 17, 19; Lucke v. Coe, 1934, 63 App.D.C. 61, 69 F.2d 379; Globe-Union, Inc., v. Chicago Telephone Supply Co., 7 Cir., 1939, 103 F.2d 722, 724; Nichols v. Minnesota Mining & Manufacturing Co., 4 Cir., 1940, 109 F.2d 162, 166; General Talking Pictures Corp. v. American T. Corp., 3 Cir., 1938, 96 F.2d 800, 812; Wright v. Runge, D.C. D.C.1939, 31 F.Supp. 844; Perkins v.

Lawrence Sperry Aircraft Co., D.C.E.D. N.Y.1932, 57 F.2d 719, 720; Kaplan v. Robertson, D.C.Md.1931, 50 F.2d 617, 619; Harper v. Zimmerman, D.C.Del. 1930, 41 F.2d 261, 264; Berry v. Robertson, D.C.Md.1930, 40 F.2d 915, 917. Cf. Rettmeyer v. Coe, D.C.D.C.1940, 44 U.S. P.Q. 640, and Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 2 Cir., 1943, 136 F.2d 186, 190.

28 Schilling v. Schwitzer-Cummins Co., 1944, 79 U.S.App.D.C. 20, 22, 23, 142 F.2d 82, 84, 85; Boucher Inventions v. Sola Electric Co., 1942, 76 U.S.App.D. C. 160, 162, 131 F.2d 225, 227, certiorari denied 1943, 318 U.S. 770, 63 S.Ct. 762, 87 L.Ed. 1140; Greene v. Beidler, 2 Cir., 1932, 58 F.2d 207, 209; Barrett Co. v. Koppers Co., 3 Cir., 1927, 22 F.2d 395. Cf. Perkins v. Lawrence Sperry Aircraft Co., D.C.E.D.N.Y.1932, 57 F.2d 719, 720, 721, 723.

29 Globe-Union, Inc., v. Chicago Telephone Supply Co., 7 Cir., 1939, 103 F.2d 722, 728; Minnesota Mining & Mfg. Co. v. Carborundum Co., 3 Cir., 1946, 155 F. 2d 746, 748.