**Richard J. CARLETON, Jr., Plaintiff,**

v.

**Robert C. WATSON, Commissioner of Patents, Defendant.**

**Civ. A. 4970-55.**

United States District Court
District of Columbia.

June 3, 1957.

Edwin R. Hutchinson, Washington, D. C., Robert S. Dunham, New York City, of counsel, for plaintiff.

C. W. Moore, Solicitor, George C. Roeming, Washington, D. C., for defendant.

KEECH, District Judge.

This is an action to compel issuance of a patent for a portable hydraulic power device to control the operation of a vertical stopper in the nozzle of a bottom-pouring ladle for pouring molten metal, specifically, molten steel. By means of applicant's device the stopper may be raised and lowered, or stopped instantaneously and accurately at any desired position, by use of a push button control at the end of a flexible cable, which affords the operator a hitherto unknown delicacy of control, yet permits him to stand out of danger, away from the ladle, and also to move freely about the pouring platform in order to observe the stream of metal and the filling of the molds when rising gases obscure his direct view. The device is known commercially as "Autopour".

The plaintiff concedes that bottom-pouring ladles with vertical stoppers have been used throughout the steel industry for fifty to seventy-five years and also that hydraulic force devices similar to that incorporated in his disclosure have been used in many different types of machines for some thirty years. It is

plaintiff's contention, however, that his adaptation of hydraulic power for the purpose disclosed, brings radically new and different results, recognized in the industry as revolutionary, as corroborated by the great commercial success of Autopour.

The evidence adduced before the court showed that the pouring of steel in open hearth melt shops is one of the most hazardous of occupations. Before Autopour was introduced, the "ladlemen" were required to operate a manual stopper lever, necessitating great strength, in close proximity to a ladle containing from 20° to 40° tons of molten steel heated to a temperature of 3000°, and in constant danger of being showered with sparks or splashed with molten metal. No matter what occurred, in order to prevent the free running of the molten steel it was necessary for the ladlemen to stay with the lever, close to the ladle, and there were fatal accidents.

Proper pouring of steel requires accurate control of the stopper, with a slow puddling of the mold at the beginning of the fill, fast pouring thereafter, and again a slow pouring to top off the mold. The ladleman must be ready at all times to adjust the stream so as to prevent the formation of gas pockets or cracks in the ingot. The desired position of the ladle stopper in the nozzle cannot be predetermined inasmuch as the size of the opening necessary to produce any given stream of molten metal varies as to each ladle and throughout the heat, with the decreasing temperature of the metal, the decreasing pressure on the stopper as the metal pours from the ladle, the erosion of the graphite tip of the stopper which occurs during the pouring of a ladleful; and other indeterminable factors. With manual operation, if the stopper becomes frozen during the pour because of solidifying metal in or around the nozzle, it is difficult to exert sufficient force to break the obstruction without causing the metal to spurt out suddenly, and the stopper frequently becomes dislodged from the nozzle on being freed, permitting the uncontrollable flow of metal. Similarly, if erosion of the stopper tip prevents tight closure of the nozzle, the dripping metal splashes as the ladle moves from one mold to the next.

For years the industry has been in constant search of effective methods of reducing the hazards of ladlemen, but until the introduction of Autopour no practical means had been devised which would permit the efficient pouring of good steel and yet enable the worker to avoid the hazards of manual ladle stopper control. Autopour permits the effortless exertion of up to 7000 pounds per square inch pressure and instantaneous and precise control of the stopper, resulting in safety and reduced fatigue for the ladleman and better steel with less waste. The device weighs 30 to 35 pounds and is easily attached to and removed from the side of the ladle. Since installation of the first Autopour unit in 1952, the device has been adopted in approximately two-thirds of the estimated possible market, and it is now extensively used in the melt shops of all the major steel plants in the United States, as well as in Mexico and Canada. Where Autopour has been used, there have been no major accidents.

The application was rejected by the Patent Office examiner on a finding that applicant had not gone beyond the teachings of the prior art, citing Wettengel patents No. 1,207,251 and No. 1,212,860 and Schulze patent No. 2,463,811. The examiner stated that applicant's commercial success appeared to stem from the fact that he had promoted his device at a time when the labor situation made it advantageous for manufacturers to use it.

The Board of Appeals of the Patent Office rejected Wettengel patent No. 1,207,251 as anticipation, but affirmed the denial of the patent on the basis of the two other patents cited. The Board found that the apparatus disclosed by Wettengel's No. 1,212,860, a means for power operation of a vertical ladle stopper by an electric motor, was inherently capable of being operated to stop and retain the stopper in any desired position;

that the hydraulic power device of the application was the same as that used by Schulze for tipping a lip-pouring ladle for molten metal; that these references would clearly suggest to the routine engineer familiar with the art the substitution of the Schulze hydraulic power device for the Wettengel electric motor, along with such physical changes as would normally be incidental to adapting it for operation of a vertical stopper; and that no new and unexpected results were obtained which would warrant a finding of invention in the combination of known elements.

In his answer to the complaint herein, the defendant again relied upon the three patents cited by the Examiner and an additional patent, Schulze No. 2,637,883. At the outset of the trial, however, defendant abandoned reliance upon Wettengel's No. 1,207,251 and Schulze's No. 2,637,883, conceding that the latter invention post-dated the instant application.

The evidence adduced before the court is that no unusual labor situation existed at the time of the introduction of Autopour. Further, unlike the Wettengel device, Autopour does not dispense with any worker employed in the manual operation of the ladle stopper, although it does effect a substantial economic saving by improving the quality of the steel poured, decreasing the percentage of waste steel from any ladle, and promoting industrial safety. The evidence also showed that there is an interchange among the major steel plants of information concerning improved safety techniques, and that Autopour was adopted by a large percentage of the industry upon learning of its merits, without any extensive advertising campaign by the manufacturer.

The court had the benefit of expert testimony as to the operation of the Wettengel device, showing, among other things, that it is not susceptible of the inherent quality found by the Board of Appeals. The Wettengel disclosure, patented in 1916, taught that it would be advantageous, in the interest of safety, to remove control of the ladle stopper from the ladleman on the pouring platform to the overhead operator of the crane which carries the ladle on a cable across the shop. The Wettengel patent further taught that it would be advantageous to pour the steel throughout the heat from a predetermined nozzle opening, to be fixed, prior to the entire pouring, by adjustment of a fiber plug and nut at the head of the device. It was the testimony of experts of some thirty years' experience in the steel industry that to obtain good steel the nozzle opening of the ladle must be adjusted continuously throughout the entire pouring operation; that the adjustments cannot be predetermined due to the various factors mentioned earlier; and that this requires alert control by a ladleman near enough to the ladle and molds to observe the stream of metal and the molds. It was estimated that in order to obtain a pressure of 5000 pounds per square inch, the Wettengel device would have to weigh approximately 350 pounds. According to the expert testimony, although the Wettengel patent is capable of arresting the movement of the stopper at levels other than the open and closed positions (the only ones contemplated by the inventor), it cannot instantaneously or accurately arrest and retain the stopper at a desired level in view of the coasting of the electric motor and operating screw for an interval after the current is cut off, the extent of such continued motion also varying an indeterminable amount, depending upon the many factors affecting the movement of the stopper. The experts further testified that they had never seen or heard of a power-operated ladle stopper in use in the industry prior to the introduction of Autopour, although the need for such a device had long been felt.

The Schulze patent No. 2,463,811, granted in 1949, discloses a hydraulic device suspended above a lip-pouring ladle of the smaller type used in iron found-

ries, which tilts the entire ladle on the axis of the bails by means of a jointed arm attached to the back of the ladle at the lower edge. The patent states that the purpose of the invention is to provide a uniform tilting of the ladle during pouring, without the jerkiness and unsteady pouring prevalent in tipping mechanisms of the prior art, and to insure at all times uniform, accurate, and sensitive control in tilting, by an operator removed a short distance from the point of pouring. According to expert testimony before the court, the intended mode of operation in the Schulze patent is a slow, steady movement over a considerable distance, whereas the purpose of the Autopour is to provide a rapidly changing rate of movement over a relatively short distance, and there is no comparison in the degree of control required in the two devices. Schulze made use of a hydraulic power device such as had been used from some thirty years in various types of machinery. The statements in his patent make it clear that mechanical ladle-tipping devices were not then new.

The Board of Appeals in its decision recognized that certain physical changes in the Wettengel patent are necessary to adapt a hydraulic device, such as used by Schulze, for operation of a vertical stopper. On the evidence before this court, it appears that the adaptation was not such as would have been apparent to anyone skilled in the art. Further, the impracticality of the Wettengel patent, which lessened the degree of vital stopper control, would have pointed away from the desirability of substituting power for manual operation of the vertical stopper of bottom-pouring ladles used in the steel industry.

If the Autopour be considered merely as a combination of old elements, the fact that all of the elements entering into the combination are old does not necessarily negative the existence of invention. Levin v. Coe, 76 U.S.App.D.C. 347, 132 F.2d 589. By merely pointing out that the several elements are old, not indicating wherein the new and novel combination claimed was revealed or indicated to such an extent as to make it producible by the use of mere skill in the art, the Patent Office does not lay a supportable basis for rejection of the patent. Broderson v. Marzall, 90 U.S. App.D.C. 78, 194 F.2d 138. It is the view of the court that the conjunction of known elements in the application does contribute a great deal not only in accomplishing a new result, namely, precise power-driven vertical stopper control, but by effecting outstanding economic and safety improvements, and that the whole does exceed the sum of its parts, within the rule of patentability enunciated in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162.

If the inventiveness of such combination be considered a close question, the conceded commercial success of the Autopour may be considered as tipping the scales in favor of patentability. Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235; Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721.

For the foregoing reasons the court will direct the issuance of a patent as prayed. Counsel will prepare and present promptly appropriate findings of fact, conclusions of law, and order.